IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MATTHEW DWOSKIN       *
  RANDI DWOSKIN,      *
             *
             *
             *
  v.            *    Civil No. CCB–11–1109
             *
BANK OF AMERICA, N.A.      *
             *
             *
             *
            *****

MEMORANDUM

Plaintiffs Matthew Dwoskin and Randi Dwoskin are homeowners who obtained a "no fee" fixed-rate mortgage through Bank of America, N.A. (the "Bank"). The Dwoskins allege that despite the Bank's representations that the mortgage was "no fee," the Bank took out lender-paid mortgage insurance on the loan and failed to tell the Dwoskins that it did so, making them unable to refinance the loan on more favorable terms at a later date. Plaintiffs allege the Bank's conduct violated the Homeowners Protection Act of 1998, 12 U.S.C. § 4901, *et seq.*, and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13–101 *et seq.* They also allege the Bank's conduct was fraudulent or, in the alternative, that it constituted negligent misrepresentation, and that it unjustly enriched the Bank. The Dwoskins seek to sue on behalf of themselves and a similarly situated class.

Now pending are the Bank's motion to dismiss (ECF No. 9) and a motion to file an additional authority in support of the motion to dismiss (ECF No. 13). For the reasons given below, the motion to file supplemental authority will be granted and the motion to dismiss will be denied.

I.      BACKGROUND

Matthew and Randi Dwoskin live in a home at 9104 Belvedere Drive in Frederick,

Maryland, which they purchased through a mortgage from Bank of America, N.A.  (the "Bank")

(Compl. ¶ 1).  The Dwoskins researched loan terms, conditions, and market rates before selecting

Bank of America and its "No Fee Mortgage Plus" program (the "No Fee" program) to finance

their new home.  (*Id.* ¶ 2).

The Bank began marketing its No Fee loans in or around May 2007.  (*Id.* ¶ 14).  In its

marketing and loan application materials, the Bank represented that the No Fee program would

"waive or pay all fees for services or products required by the Bank in order to provide a 'no fee'

fixed mortgage to qualifying buyers."  (*Id.*).   The Bank specifically promised it would not

require private mortgage insurance ("PMI") to be placed on the property.  (*Id.* ¶ 15).  When a

mortgage loan is for more than 80% of a home's value, borrowers typically are required to obtain

mortgage insurance directly through a private mortgage insurance company or indirectly through

lender-paid mortgage insurance ("LPMI").  (*Id.* ¶ 17).  If borrowers purchase PMI, they do so at

closing and independently pay insurance premiums to the mortgage insurance company.  (*Id.* ¶

19).  If a lender provides LPMI, the lender pays the cost of mortgage insurance and typically

passes on that cost to the borrowers by charging a higher interest rate on the loan.  (*Id.* ¶ 20).  In

its No Fee program, the Bank expressly agreed that PMI was among the fees and services it

would waive or pay for borrowers in its No Fee program.  (*Id.* ¶ 15).  Indeed, the president of

consumer real estate for the Bank told the Washington Post in May 2007 that No Fee loans did

not include any private mortgage insurance because of the Bank's vast reserves and stated: "We

are the investor, we assume the risk." (*Id.* ¶ 22).  The article explained that the Bank was "self-insuring the risk and charging customers nothing for the service." (*Id.*).  Plaintiffs claim these statements were untrue and that the Bank hid the fees involved in the No Fee mortgages, in part by not giving borrowers the lower rates they ordinarily would have been able to receive by paying "points" up front.[1]  (*Id.* ¶ 23).

The Dwoskins applied for a residential loan with the Bank and were approved on or about November 18, 2008, for a loan of $500,564 through the No Fee program.  (*Id.* ¶¶ 24–26).  This loan amount represented more than 80% of the value of the property for which they sought the mortgage, which typically would mean the Dwoskins would have to obtain either PMI or LPMI.  (*Id.* ¶ 28).  The Dwoskins claim that in accepting the Bank's approval of their loan, they relied on the Bank's promise that their loan was truly no fee and that no PMI would be required.  (*Id.* ¶ 31).  The Dwoskins closed on the loan on December 9, 2008, when they executed a 30-year mortgage in favor of the Bank in the amount of $500,564 at a fixed interest rate of 6.375%.  (*Id.* ¶ 32).  At settlement, the Dwoskins were presented with a statement that showed no evidence the Bank had placed LPMI on the property and the Bank provided no written disclosures of any intent to place LPMI on the property.  (*Id.* ¶ 36).  The Dwoskins claim the Bank misrepresented its intention of placing LPMI on the property by hiding or omitting the fact from the disclosures made at closing.  (*Id.*).

In 2009, the Dwoskins attempted to refinance their mortgage under the Home Affordable Refinance Program ("HARP") through the Bank.  (*Id.* ¶ 39).  At that time, they learned the Bank had paid for LPMI on their home without their knowledge or consent.  (*Id.* ¶ 40).  The Dwoskins

---

[1] A "point" is one percent of the face value of a loan, especially a mortgage loan, paid up front to the lender as a service charge or placement fee.  *See* Black's Law Dictionary (9th ed. 2009).  A borrower will often pay a point to the lender in order to obtain a lower interest rate on the loan.

assert that because of the previously undisclosed LPMI, they were unable to qualify for refinancing under HARP. (*Id.* ¶¶ 41, 47–48). The Dwoskins' attorney wrote to the Bank on September 18, 2009, advising the Bank that the Dwoskins were never advised of the LPMI and did not consent to the Bank placing LPMI on the property, and requesting copies of any disclosures related to the LPMI. (*Id.* ¶ 42). On November 6, 2009, Kaywana Jamison, an officer with the Bank, sent the Dwoskins' attorney an email stating: "When this loan was originated, mortgage insurance was not placed on the loan and the bank had no intention of ever placing mortgage insurance on the loan . . . . However, unforeseen and unprecedented market events mandated that the bank pool the loan and sell it in the secondary market; and to make the loan marketable, the bank had to insure it." (*Id.* ¶ 43).[2]

Until the LPMI is cancelled, the Dwoskins believe they will be unable to refinance their mortgage through HARP or similar programs, depriving them of the benefits of lower interest rates. (*Id.* ¶ 49). They attempted to mitigate these damages by asking the Bank to either cancel the LPMI or refinance their loan to a rate commensurate with current market conditions and without any mortgage insurance. (*Id.* ¶ 50). The Dwoskins also have tried to refinance their mortgage with other lenders but have been unable to do so because of the LPMI on the loan. (*Id.*).

## II.     STANDARD OF REVIEW

The Bank moves to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

---

[2] The precise date LPMI was placed on the loan is not stated in the complaint.

"'[T]he purpose of Rule 12(b)(6) is to test the legal sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)).  To survive a motion to dismiss under FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  When ruling on a 12(b)(6) motion, the court assumes the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor.  *Edwards*, 178 F.3d at 244.  A complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965 (internal quotations omitted).

The Bank also moves to dismiss the fraud and Maryland Consumer Protection Act ("MCPA") claims on the ground that the pleadings lack the particularity required under FRCP 9(b).  That rule requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

III.    MOTION TO DISMISS

a.   Homeowners Protection Act of 1998

The Homeowners Protection Act of 1998 ("HPA") requires, among other things, that lenders make certain disclosures about mortgage insurance in residential mortgage transactions. *See* 12 U.S.C. § 4901 *et seq.*   The HPA obligates lenders to make these written disclosures on

loans where LPMI is "required in connection with a residential mortgage transaction." *Id.*

§ 4905(c).   LPMI is defined as "private mortgage insurance that is required in connection with a

residential mortgage transaction, payments for which are made by a person other than the

borrower . . . ." 12 U.S.C. § 4905(a)(2).  The disclosures include the fact that a loan with LPMI

usually results in a higher interest rate than a loan with PMI and that unlike PMI, which can end

automatically once borrowers have enough equity in their home, LPMI only terminates when a

loan is refinanced, paid off, or otherwise terminated.   *Id.* § 4905(c)(1)(A)-(B).  The lender must

make these disclosures no later than the date of the loan commitment.  *Id.* § 4905(c)(1).

The Bank argues it had no duty to make disclosures to the Dwoskins under § 4905

because it contends no LPMI was required on the Dwoskin loan.  (Def.'s Mot. to Dismiss at 5–

7).  The Bank argues "required" in § 4905 means "required as a condition of the loan."  (Def.'s

Reply at 2).  It contends that because the Bank did not require itself to obtain LPMI on the

Dwoskin loan at origination, the disclosure requirements of the HPA do not apply.  (Def.'s Reply

at 2).  The Bank avers that the Dwoskin loan contemplated only a potential requirement for PMI

paid by the borrower.  (*Id.* at 6).  In fact, it argues the statements made by bank officers cited in

the complaint make clear the Bank did not contemplate placing LPMI on the Dwoskin loan or

other No Fee loans until after those loans were taken out and the Bank only did so because of

"unforeseen and unprecedented market events."  (*Id.*).  The Bank also contends the Dwoskins'

allegations that the Bank purchased LPMI without their knowledge, consent, or approval are

irrelevant because LPMI was not required on their mortgage.  (Def.'s Mot. to Dismiss at 7).

The Dwoskins argue that reading "required" in the narrow manner suggested by the Bank

undermines the purposes of the HPA.  (Pl.'s Opp'n at 5).  They note that interpreting "required"

to mean "required as a condition of the loan," would mean that as long as banks did not require

themselves to purchase LPMI at a loan's origination, the banks could avoid the disclosure requirements of the HPA altogether by routinely purchasing LPMI after closing and concealing the LPMI's existence from borrowers, defeating the purpose of the statute.   (*Id.*).   The Dwoskins contend that the HPA should instead be read as requiring disclosures in any residential mortgage transaction in which PMI or LPMI is placed on the property.   (Pl.'s Opp'n at 7).

There is little case law interpreting or enforcing § 4905.   Only four cases cite to the provision.   *See O'Connor v. Wells Fargo Home Mortg.*, No. 1:08–CV–0281–JEC, 2011 WL 248006 (N.D. Ga. Jan. 24, 2011); *Scott v. GMAC Mortg.*, No. 3:10cv00024, 2010 WL 3340518 (W.D. Va. Aug. 25, 2010); *Robinson v. Argent Mortg. Co.*, LLC, No. C–09–2075, 2010 WL 145092 (N.D. Cal. Jan. 8, 2010); *Tani v. President/CEO Salomon Brothers Realty Corp./Citigroup*, No. Civ. CCB–03–2566, 2005 WL 1334604 (D. Md. May 31, 2005).[3]   In *Tani*, I dismissed a claim under § 4905 based only on the statute of limitations; the case is therefore of little guidance.  *Tani*, 2005 WL 1334604, at *4.   Likewise, although the plaintiff in *Scott* brought a claim under § 4905, the decision addresses a motion to dismiss only the pendent state law claims.  *Scott*, 2010 WL 33350518, *2.   The remaining two cases, *Robinson* and *O'Connor*, are more relevant to the present case.

In *Robinson* the court dismissed a claim by a pro se plaintiff brought under the HPA because the plaintiff failed to allege that he was required to obtain either LPMI or PMI. *Robinson*, 2010 WL 145092, at *2.   As a consequence, the court found "plaintiff's allegations fail[ed] to implicate any substantive provision of the HPA."  *Id.*   The Bank argues the Dwoskins likewise failed to allege they were required to obtain LPMI.   (Def.'s Mot. to Dismiss at 6; Def.'s Reply at 5).   The Dwoskins respond by arguing that, unlike the plaintiff in *Robinson*, they

---

[3] Unpublished opinions are cited not as precedent but only for the relevance of their reasoning.

alleged LPMI was actually placed on their property and that because it was placed on the property the Bank in fact required LPMI.  (Pl.'s Opp'n at 9).  This is far different from *Robinson*, where despite the court allowing leave to amend the complaint several times, the plaintiff failed to allege LPMI or PMI was ever placed on his property at all.  *See* Fourth Am. Class Action Compl., *Robinson*, 2010 WL 145092, (ECF No. 64).  *Robinson* therefore provides little support for the Bank's argument.

In *O'Connor*, the court directly addressed the meaning of "required" within § 4905.  *See O'Connor*, 2011 WL 248006, at *3–4.  The defendant Bank in that case contended § 4905 only mandates disclosure when mortgage insurance is secured prior to closing and argued insurance obtained after closing cannot be deemed "required" under § 4905.  *Id.* at *3.  As the *O'Connor* court noted, however, "the plain language of the HPA does not impose any time limits on the disclosure requirements associated with LPMI."  *Id.*  The statute states only that disclosures are necessary whenever mortgage insurance is "required in connection with a residential mortgage transaction."  12 U.S.C. § 4905(c).  Such language "does not explicitly or implicitly limit the application of the disclosure requirements to cases where the lender has secured mortgage insurance prior to closing."  *O'Connor*, 2011 WL 249006, at *3.  In *O'Connor* it was the standard business practice of the defendant bank to require mortgage insurance on all loans where the loan-to-value ratio ("LTV") was greater than 80%.[4]  *Id.*  Indeed, the defendant Bank appeared to increase the interest rate on the plaintiff's loan to account for such insurance.  *Id.* at *3–4.  The defendant Bank also appeared to comply with other disclosure provisions of the HPA, in particular by sending the plaintiff a letter three years after his refinancing, notifying him that

---

[4] LTV is the ratio of the amount of a borrower's mortgage to the value of the property secured by that mortgage.  *See* Black's Law Dictionary (9th ed. 2009).  It is often expressed as a percent.  For example, an $80,000 mortgage on a $100,000 property results in an LTV of 80%.

he reached an LTV that no longer required mortgage insurance.  *Id.* at *4.  The Court rejected, "[b]ased on the plain language of the HPA," the Bank's argument that after-acquired mortgage insurance can never qualify as required LPMI.  *Id.*  Despite the fact that LPMI was not placed on the loan until five days after closing, the court found, in denying the bank's summary judgment motion, that "evidence suggests that the insurance was 'required' by defendant's standard business practices and by its investors."  *Id.*

In this case, the Bank contends the Dwoskins failed to allege LPMI was required on their loan.  (Def.'s Reply at 6).  Indeed, the Bank believes statements by its officers that the LPMI was only taken out after unforeseen and unprecedented market events make clear the loan did not require LPMI.  (*Id.*).  The pleadings, however, assert that these statements by Bank officers were "fraudulent misrepresentations." (Compl. ¶¶ 7, 37).  Whether these statements were in fact false will be an issue in the case going forward, but taken in the light most favorable to the plaintiffs, the complaint can be read to allege that the Bank misrepresented an intention to place LPMI on No Fee mortgage loans.  The fact that the LPMI was not taken out until after the Dwoskins closed on their loan does not defeat an argument that LPMI was required on their loan.  *See O'Connor*, 2011 WL 249006, at *4.  The complaint can therefore be read to state a plausible claim under the HPA.  Defendant's motion to dismiss this claim will be denied.

  b. Preemption by HPA of Fraud, Negligent Misrepresentation, and Maryland Consumer Protection Act claims

The Bank next argues that the Dwoskins' claims for fraud, negligent misrepresentation, and violations of the MCPA are expressly preempted.  Under the Supremacy Clause of Article VI of the U.S. Constitution, "federal statutes and regulations properly enacted and promulgated

can nullify conflicting state or local actions." *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005) (internal citations and quotations omitted).  Federal law may preempt state law under theories of either express, field, or conflict preemption.  *Id.* at 595–96.  In this case, the Bank argues the fraud, negligent misrepresentation, and MCPA claims are preempted by the HPA's express preemption clause.  *See* 12 U.S.C. § 4908(a)(1).  That clause states:

> With respect to any residential mortgage or residential mortgage transaction consummated after [July 29, 1999], and except as provided in paragraph (2), the provisions of this chapter shall supersede any provisions of the law of any State relating to requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions, cancellation or automatic termination of such private mortgage insurance, any disclosure of information addressed by this chapter, and any other matter specifically addressed by this chapter.

*Id.* Subsection 2 exempts protected state laws from preemption, except to the extent such laws are inconsistent with any provision of the HPA.  *Id.* § 4908(a)(2).  The statute defines protected state laws as those (i) regarding any requirements relating to private mortgage insurance in connection with residential mortgage transactions; (ii) enacted not later than two years after July 29, 1998; and (iii) that are the law of a state that had in effect, on or before January 2, 1998, any state law described in clause (i).  *Id.* § 4908(c).  Protected state laws are not inconsistent with the HPA if they require disclosure of information (I) that provides more information than the information required by the HPA; or (II) more often or at an earlier date than is required by the HPA.  *Id.* § 4908(B)(ii).  The statute also contains a savings clause that provides its preemption provision should not be construed to preclude private agreements that provide for cancellation or termination of mortgage insurance before the dates required under the HPA.  *Id.* § 4910(b).

Only two federal courts have interpreted the HPA's preemption provision.  *See Scott*,

2010 WL 3340518; *Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385 (S.D.N.Y. 2010).

The *Fellows* court was the first to analyze the HPA's preemption clause.  *Fellows*, 710 F.

Supp. 2d at 399.  The plaintiff in that case brought claims under the New York Deceptive Trade

Practices Act ("NYDTPA"), and for breach of contract and breach of the implied covenant of

good faith and fair dealing.  *Id.* at 389.  The plaintiff claimed CitiMortgage wrongfully refused to

cancel the PMI on his mortgage and that the disclosures it provided him were inadequate.  *Id.*

Although the plaintiff brought no claims under the HPA, the defendant bank argued the HPA

preempted all the state law claims.  *Id.*  The *Fellows* court relied on case law interpreting the

preemption provisions of the Employee Retirement Income Security Act ("ERISA") and the

Airline Deregulation Act of 1978 ("ADA") because, like the HPA, those statues explicitly

preempt state law "relating to" the federal legislation.  *Id.*  The court found that even though

"relating to" is expansive language, the phrase does not modify the presumption that Congress

did not intend to supplant state law.  *Id.* at 399–400 (citing *N.Y. State Conference of Blue Cross*

*& Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 1666–67 (1996)).

The Supreme Court has defined "relating to" in the ADA context as "having a connection with,

or reference to . . . ."  *Id.* at 400 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384,

112 S. Ct. 2031, 2037 (1992)).

The *Fellows* court imported the Supreme Court's terminology, holding the HPA

"preempts all state laws that have 'a connection with' or 'reference to' requirements for, inter

alia, cancellation of PMI and disclosure of information concerning PMI cancellation."  *Fellows*,

710 F. Supp. 2d at 401.  It found the claim under the NYDTPA expressly preempted because the

plaintiff alleged the bank failed to provide adequate disclosures regarding his cancellation rights

and failed to cancel his PMI.  *Id.* at 402.  In this context, the plaintiff was attempting to use the

state law to impose requirements for PMI cancellation and disclosure not required by the HPA.

*Id.*  In contrast, the *Fellows* court held the breach of contract claim was not preempted because it

was based on the bank's "self-imposed undertakings under the [m]ortgage."  *Id.* at 403–04.  The

HPA's savings clause, which explicitly exempts from preemption agreements providing for the

cancellation or termination of PMI before dates established under the HPA, provided further

support for this conclusion, the *Fellows* court reasoned.  *Id.* at 404 (citing 12 U.S.C. § 4910(b)).

In *Scott*, the defendant bank argued the HPA preempted claims for both common law

actual fraud and common law constructive fraud.  *Scott*, 2010 WL 3340518, at *2.  Although the

*Scott* court acknowledged the "relating to" language of § 4908(a)(1) constitutes an expansive

preemption clause, it found neither fraud claim preempted by the HPA.  *Id.* at *4–5.  The *Scott*

court treated the "most relevant question" as whether allowing such claims "would confound

Congress's objectives in passing the HPA, that is, the creation and enforcement of a uniform set

of regulations governing disclosure of mortgage insurance."  *Id.* at *5.  It found allowing claims

for fraud would not threaten the structural integrity of the HPA, because fraud claims are claims

of general application and do not relate directly to the disclosure requirements of § 4905.  *Id.*

Moreover, it emphasized the evidence required to prove such claims is "entirely distinct" from

that required to prove a HPA violation.  *Id.*  While a claim under the HPA would depend on

evidence of a failure to disclose, a claim for fraud depends on evidence of an affirmative

misrepresentation of a material fact.  *Id.*  Moreover, fraud claims do not "directly affect the

application of the HPA's disclosure requirements" because they "enforce no requirements

greater or lesser than those embodied in the HPA."  *Id.*   Despite the fact that *Scott* was decided

more than three months after *Fellows*, it does not cite *Fellows* or attempt to reconcile the *Fellows*

court's decision to preempt a state consumer protection law claim with its own decision not to preempt common law fraud claims.

In this case, the Bank argues the HPA preempts both plaintiff's fraud and state law consumer protection claims. (Def.'s Mot. to Dismiss at 12–14). Neither of these claims, however, appear to "relate to" the "requirements for . . . disclosure of information" under the HPA. *See* 12 U.S.C. § 4908(a)(1). The HPA sets out a detailed list of written notices that must be made to borrowers in residential mortgage transactions in which LPMI is required. 12 U.S.C. § 4905(c). These include specific information about how LPMI differs from PMI and how and when it can terminate. *Id.* The statute also imposes obligations on when and how a Bank must cancel PMI. *See* 12 U.S.C. § 4902.

Unlike the specific requirements of the HPA, claims for fraud or negligent misrepresentation impose a separate duty: the duty not to lie or misrepresent information. In this case, the Dwoskins base their fraud claim on an allegation that the Bank knew its statements that the Dwoskins' mortgage would not be encumbered by mortgage insurance were false at the time they were made. (Compl. ¶¶ 70–78). In the alternative, they allege these misrepresentations were negligent. (*Id.* ¶¶ 79–84). Allowing these claims to proceed is not inconsistent with the HPA. The fraud and misrepresentation claims center on whether the Bank misrepresented a fact to the plaintiffs. Proving such a claim will not focus on the detailed disclosure provisions of the HPA, but rather on the Bank's alleged false representation to the plaintiffs. *See Scott,* 2010 WL 3340518, at *5 (explaining the difference between fraud and HPA claims); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008) (listing elements for fraud under Maryland law). *Cf. Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192–93 (4th Cir. 2007) (finding fraud claim subject to dismissal under conflict preemption when the state claim "essentially require[d] the

same proof as claims asserted under the FLSA.").   Fraud claims "merely require[] parties to a transaction avoid deceiving each other."  *Scott*, 2010 WL 3340518, at *5.   As such, they are not preempted by the HPA.

Likewise, the Dwoskins' claim under the MCPA seeks to enforce a similar general duty not to mislead or deceive customers.  Plaintiffs claim the Bank violated several provisions of the MCPA by making false statements that borrowers in the No Fee program would not be burdened with mortgage insurance, when in fact they were.  (Compl. ¶ 90).  This type of claim under the MCPA is far different from the state consumer protection claim advanced in *Fellows*.   In *Fellows*, the plaintiff based his state consumer protection act claim on allegations that: (1) the defendant Bank required him to continue to pay PMI even after he should have been eligible for cancellation, (2) it failed to inform him, when his mortgage was about to become two years old, of his right to cancel PMI based on the current value of the property, (3) its practices and policy prevented PMI cancellation on the second anniversary of the mortgage's origination, (4) its practice of using the servicing date, rather than the origination date, for purposes of determining eligibility for PMI cancellation was "unfair, deceptive, and illegal," and (5) the Bank deliberately undervalued the property to avoid cancelling the PMI.  *Fellows*, 710 F. Supp. 2d at 394.  The court held these claims were preempted because the plaintiff sought to use the consumer protection statute "to impose requirements for PMI cancellation and disclosure that are not required by the HPA."  *Id.* at 402.  Unlike *Fellows*, the Dwoskins do not seek to use the MCPA to impose requirements on the content of PMI-related disclosures or the procedures for PMI cancellation.  Instead, the Dwoskins seek to use the MCPA to enforce a general claim that a business cannot tell a customer one thing and then proceed to do another.  Such claims under the MCPA are not preempted by the HPA.

c.   Economic Loss Rule

The Bank next argues that even if the fraud and negligent misrepresentation claims are not preempted, they are barred by the economic loss rule, which generally bars plaintiffs from recovering in tort for losses that are purely economic.  *U.S. Gypsum v. Baltimore*, 336 Md. 145, 156, 647 A.2d 405, 410 (1994).  This court and others, however, have recognized that the economic loss rule does not bar claims of fraudulent inducement to contract.  *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 885 (8th Cir. 2000); *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298, 311 & n.22 (D. Md. 2000).  In this case, the Dwoskins plead an independent claim of fraud in the inducement, in that they allege the Bank lied about (or, in the alternative, negligently misrepresented) whether mortgage insurance would be placed on their loan.  (Compl. ¶¶ 70–84).  Such claims are an exception to the economic loss doctrine because they are "necessarily prior to the contract" and "independent of the contract."  *See Marvin Lumber & Cedar Co.*, 223 F.3d at 885.  The fraud and negligent misrepresentation claims are therefore not barred by the economic loss doctrine.

d.   FRCP 9(b) Pleading Requirements

The Bank also argues the fraud and MCPA claims fail because they do not meet the pleading requirements of FRCP 9(b).  (Def.'s Mot. to Dismiss at 14–23).  FRCP 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Because the MCPA claim sounds in fraud, it is also subject to the heightened pleading requirement of FRCP 9(b).  *See Haley v. Corcoran*, 659 F. Supp. 2d 714, 724 & n.10 (D. Md. 2007); *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007).  The Dwoskins are therefore required to allege the "time, place, and contents of

15

the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" for both the fraud and MCPA claims.  *Harrison v. Westinghouse Savannah River Co.*, 176 F. 3d 776, 784 (4th Cir. 1999).

The requirements of FRCP 9(b) have four purposes: (1) to ensure the defendant has enough information to form a defense; (2) to protect defendants from frivolous suits; (3) to eliminate fraud actions in which all facts are learned after discovery, and (4) to protect defendants from harm to their goodwill and reputation.  *Id.* (citing *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1055, 1056–57 (S.D. Ga. 1990)).  Despite the particularity requirements of FRCP 9(b), "conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive" are allowed.  *Id.*  Indeed, courts should hesitate to dismiss complaints under FRCP 9(b) if "the court is satisfied that (1) the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Id.*

The Dwoskins have satisfied FRCP 9(b).    The complaint identifies two specific representations made by the Bank to the Dwoskins in the November 18, 2008 approval letter, which the Dwoskins allege the Bank knew were false.  (Compl. ¶ 71).   The first is the representation that the Bank would waive or pay all fees for services or products required by the Bank for the mortgage, and the second is the omission of any indication the Bank was purchasing LPMI on the loan.  (*Id.*).  The Dwoskins allege the Bank knew or should have known these statements were false and that they were made with intent to deceive the Dwoskins and other similarly situated borrowers.  (*Id.* ¶¶ 73–75).  The complaint also cites specific statements by bank officers that plaintiffs aver were false.  (*Id.* ¶¶ 21–22).  The Dwoskins similarly identify

the specific statements they claim violated the MCPA.  (*Id.* ¶ 90).  Such allegations are sufficient

to put the Bank on notice of the allegations against it and allow it to prepare a defense.

The claims also do not suffer from a failure to plead damages.  (*See* Def.'s Mot. to

Dismiss at 21–23).  Under Maryland law, to state a claim for fraud a plaintiff must have relied on

a false misrepresentation and had the right to rely on it, and must have suffered compensable

injury resulting from the misrepresentation.  *Gourdine*, 405 Md. at 758, 955 A.2d at 791.[5]

Likewise, under the MCPA, an individual can only bring a claim if he can "establish the nature

of the actual injury or loss that he or she allegedly sustained as a result of the prohibited

practice."  *Lloyd v. General Motors Corp.*, 397 Md. 108, 148, 916 A.2d 257, 280 (2007) (quoting

*Citaramanis v. Hallowell*, 328 Md. 142, 149, 613 A.2d 964, 968 (1992)).  Here, the Dwoskins

allege that the LPMI on their mortgage prevented them from refinancing their home at a more

favorable interest rate.  It is reasonable to infer that but for the alleged misrepresentation about

whether LPMI would be attached to the mortgage, the Dwosksins would not have taken out a

mortgage with LPMI that prevented them from refinancing at a later date.  In addition, the

Dwoskins allege the Bank hid fees from borrowers, including not giving borrowers the lower

rates they would have received were it not for the hidden cost of the LPMI.  The complaint can

therefore be read to allege that the Dwoskins suffered damages from paying a higher interest rate

than they otherwise would have been charged.

Finally, the Bank's reliance on *Stolba v. Wells Fargo & Co.*, filed separately as

supplemental authority, fails to support dismissal of this claim.  (ECF No. 13); *See Stolba v.*

---

[5] The other elements of fraud are: (1) that the defendant made a false representation to the
plaintiff, (2) that the falsity was either known to the defendant or that the representation was
made with reckless indifference as to its truth, (3) that the misrepresentation was made for the
purpose of defrauding the plaintiff.  *Gourdine*, 405 Md. at 758, 955 A.2d at 791.

*Wells Fargo & Co.*, 10–cv–6014, 2011 WL 3444078 (D. N.J. Aug. 8, 2011). In *Stolba*, the plaintiffs and the bank entered into discussions about a trial plan that would modify their mortgages to avoid foreclosure. 2011 WL 3444078 at *1. After several months, the bank told these customers it had not received the necessary paperwork and it intended to foreclose. *Id.* In dismissing claims for fraud and negligent misrepresentation, the court held the defendant Bank's statements to plaintiffs that their property would not be foreclosed if they complied with the terms of the trial plan were not actionable because statements "as to future or contingent events do not constitute misrepresentations." *Id.* at *4. It noted "a mere promise to do something in the future, which goes unfulfilled, does not constitute fraud unless the promisor had no intention of keeping such promise at the time it was made." *Id.* But the plaintiffs in that case failed to allege the Bank had no intention of modifying the loans when the parties began discussing the trial plan. *Id.* That is a scenario different from the present case. Here, the Dwoskins allege the Bank knew or should have known its statements that their mortgage would not have LPMI were false when they were made. (Compl. ¶ 74).

The defendant's motion to dismiss the fraud and MCPA claims will therefore be denied.

e.   Negligent Misrepresentation

Negligent misrepresentation has five elements under Maryland law. They are: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence." *Griesi v. Atl. Gen.*

*Hosp. Corp.*, 360 Md. 1, 11, 756 A.2d 548, 553 (2000) (citing *Weisman v. Connors*, 312 Md. 428, 444, 540 A.2d 783, 791 (1988)).

The Bank argues the Dwoskins have no claim for negligent misrepresentation because the Bank owed no duty of care to them.  (Def.'s Mot. to Dismiss at 27).  When dealing with claims of economic loss due to negligent misrepresentation, a plaintiff must prove the defendant owed a duty of care by demonstrating an intimate nexus between them.  *Griesi*, 360 Md. at 12–13; 756 A.2d at 554.  This nexus can be demonstrated by showing contractual privity or its equivalent. *Id.* at 13; 756 A.2d at 554 (citing *Weisman*, 312 Md. at 446, 540 A.2d at 791; *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534–35, 515 A.2d 756, 759–60 (1986)).  The equivalent has been found in special relationships consummated during the course of pre-contract negotiations. *Id.*  (citations omitted).

Courts have long found that liability can arise when there is a duty "to give the correct information."  *Id.* at 14; 756 A.2d at 554 (*citing Int'l Prod. Co. v. Erie R. Co.*, 244 N.Y. 331, 447, 155 N.E. 662, 792 (1927)).  Such a duty exists in a variety of business relationships.  *See, e.g.*, *Griesi*, 360 Md. at 17, 756 A.2d at 556 (finding an intimate nexus existed during extensive but arms-length pre-employment negotiations); *Weisman*, 312 Md. at 448, 540 A.3d at 792–93 (stating as settled precedent that "there may be the requisite special relationship or intimate nexus in an arm's length commercial transaction involving only pecuniary loss"); *Giant Food, Inc., v. Ice King, Inc.*, 74 Md. App. 183, 189, 536 A.2d 1182, 1185 (1988) (finding special relationship between buyer and seller and stating "the duty to furnish correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information").

In considering the existence of a duty to give correct information, courts have recognized that "[a]n inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another." *Griesi*, 360 Md. at 14, 756 A.2d at 554 (citing *Weisman*, 312 Md. at 447, 540 A.2d at 972).   This analysis should also focus on whether there was "knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property." *Id.* at 13–14, 756 A.2d at 554 (citing *Weisman*, 312 Md. at 447, 540 A.2d at 792).

The Bank relies primarily on *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707 (D. Md. 2008).   In that case, the plaintiff borrowers alleged the defendant bank made false statements to induce them into a loan that converted their fixed-rate mortgage into an adjustable-rate mortgage.  *Id.* at 710.   They brought six claims, including fraud and negligent misrepresentation.   While the defendant bank argued it had no duty to place the plaintiffs in a loan most "suitable" to them, the court dismissed these claims on another ground entirely: that there was no evidence the plaintiffs relied on anything the bank represented to them.  *Id.* at 718. The court also rejected a stand-alone negligence claim asserting a violation of the duty of care, stating that the plaintiffs were not placed into a loan or transaction they could not understand.  *Id.* at 719.   This provides scant support, however, for the Bank's argument in the present case.

Taken in the light most favorable to the Dwoskins, the complaint alleges the couple sought a loan without LPMI and that the Bank represented to them the No Fee loan would not contain either PMI or LPMI.   In this context, the Bank can fairly be said to have a duty to give correct information, as it had knowledge the information was desired for a serious purpose, that

potential borrowers would rely on it, and that if the information was false these borrowers would be injured. *See Griesi*, 360 Md. at 13–14, 756 A.2d at 554.  The Bank's motion to dismiss the negligent misrepresentation claim will therefore be denied.

> f.   Unjust Enrichment

In Maryland, a claim of unjust enrichment has three elements.  *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294–95, 936 A.2d 343, 352 (2007).  There must be: (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.  *Id.* at 295, 936 A.2d at 352.  An unjust enrichment claim is equitable, and the right to restitution is subject to counter-equities that the recipients of the benefits may assert.  *Id.* at 297, 936 A.2d at 352 (citing Daniel B. Dobbs, *Handbook on the Law of Remedies* § 11.9 (1973)).  A successful unjust enrichment claim deprives a defendant of "benefits that in equity and good conscience he ought not to keep, even though he may have received the benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses*." Id.* at 295–96, 936 A.2d at 352 (citing *Dep't of Hous. & Cmty. Dev. v. Mullen*, 165 Md. App. 624, 259, 886 A.2d 911, 921 (2005)).

The Dwoskins argue the Bank was unjustly enriched by "charging higher interest rates to No Fee customers than were charged to other Bank customers."  (Compl. ¶ 86).  In addition, the Dwoskins claim the Bank was unjustly enriched because it benefitted from the "higher interest rates of clients who were unable to refinance mortgages because of the hidden Lender Paid PMI on their homes."  (*Id.* ¶ 87).   They argue that by unknowingly paying for LPMI through

21

"deceptive inclusion" of LPMI on their No Fee loan, they benefitted the Bank.  (Pl.'s Opp'n at

23).  The Bank contends that the Dwoskins cannot advance an unjust enrichment claim,

however, because their relationship with the Bank is contractual, precluding them from

recovering in equity.  (Def.'s Mot. to Dismiss at 29–30).

The general rule is that no quasi-contractual claim can arise when a contract exists

between the parties concerning the same subject matter as the quasi-contractual claim.  *Cnty.*

*Comm'rs of Caroline Cnty v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600,

607 (2000).  The rule seeks to prevent parties from recovering when their expectations under a

contract are not realized, even though under the contract the parties assumed the risk of having

those expectations defeated.  *Id.*  The law does not allow such parties to turn to quasi-contract for

recovery.  *Id.*

In this case, the Dwoskins contend their contract with the Bank does not include the

subject of LPMI and therefore the unjust enrichment claim is not barred because it is beyond the

subject matter of the contract.  (Pl.'s Opp'n at 22).  I need not determine the precise subject

matters of the Dwoskins' contractual relationship with the bank, however, because there is an

exception to the general rule barring their recovery in quasi-contract.  In Maryland, courts may

allow an unjust enrichment claim even where there is a contract if there is evidence of fraud or

bad faith in the formation of the contract that would otherwise govern.  *See Dashiell*, 358 Md. at

100, 747 A.2d at 609; *Kwang Dong Pharm. Co. v. Han*, 205 F. Supp. 2d 489, 497 (D. Md. 2002).

As noted above, the Dwoskins have pleaded a plausible claim of fraud in the formation of the

contract.  Thus, the exception applies and the claim for unjust enrichment is not barred.

The Bank next argues that the Dwoskins have not established the Bank was unjustly enriched.  (Def.'s Mot. to Dismiss at 30–31).  But read in the light most favorable to the Dwoskins, their complaint alleges they paid a higher interest rate for the No Fee loan than they would have for a loan without LPMI.  (Compl. ¶ 86).   They argue the higher premium unjustly enriched the Bank, in part because clients could not refinance their No Fee loans by taking them to other banks if those loans were encumbered with LPMI.  (*Id.* at ¶ 87).   This states a plausible claim for unjust enrichment and the defendant's motion to dismiss this count will be denied.

g.   Injunction

The Dwoskins also seek an injunction requiring the Bank to cancel any LPMI placed on the Dwoskins' property.  (Def.'s Mot. to Dismiss at 31–32).  A plaintiff seeking a permanent injunction must demonstrate: (1) it has suffered an irreparable injury; (2) monetary damages are inadequate to compensate for that injury; (3) considering the balance of the hardships to the parties, an equitable remedy is "warranted," and (4) "the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1839 (2006).

The Bank moves to dismiss the Dwoskins' request for an injunction because injunctive relief is a remedy and not a cause of action and it is improper to frame a request for an injunction as a separate cause of action, as the complaint does in this case.  (Def.'s Mot. to Dismiss at 31–32).  Although that is true, the Dwoskins have adequately pled five causes of action in this case, leaving them causes of action on which they can seek the requested injunction.  *See Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 682 n.1 (D. Md. 2001) (noting that "a request for injunctive relief does not constitute an independent cause of action; rather, the

23

injunction is merely the remedy sought for the legal wrongs alleged in . . . the substantive counts").

The Bank also argues that even if the Dwoskins prove one or more of their causes of action, no injunction should issue in this case because monetary damages are adequate.  (Def.'s Mot. to Dismiss at 31–32).  Although this will certainly be an issue in the case going forward, I cannot say with legal certainty at this stage of the litigation that monetary damages will be adequate.  Accordingly, the Dwoskins' request for an injunction will not be dismissed at this time.  The motion to dismiss the claim to injunctive relief will be denied without prejudice, preserving the Bank's opportunity to argue the merits of such a remedy at a later stage of the litigation.

IV.     CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss will be denied.  A separate Order follows.

March 26, 2012
Date

/s/
Catherine C. Blake
United States District Judge