IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DWOSKIN, *et al.*                          :
                                           :
                                           :
        v.                                 :        Civil No. CCB-11-1109
                                           :
                                           :
BANK OF AMERICA, N.A.                       :
                                           :

## MEMORANDUM

The named plaintiffs in this case claim to represent a putative class of homeowners who

obtained "no fee" fixed-rate mortgages through defendant Bank of America, N.A. ("the Bank").

They say the Bank purchased mortgage insurance on their loans without their knowledge or

consent, violating certain disclosure provisions set out in the Homeowners Protection Act of

1998, 12 U.S.C. §§ 4901-4910 ("the HPA" or "the Act").[1] Now pending are cross-motions for

summary judgment on the plaintiffs' HPA claim. The court finds oral argument unnecessary to

resolve the issues. *See* Local R. 105.6 (D. Md. 2014). For the reasons that follow, the court will

grant the defendant's motion for summary judgment.[2]

## BACKGROUND

### I.      The HPA

Private mortgage insurance ("PMI") is insurance that protects a lender from the risk that a

borrower will default on a mortgage. S. REP. No. 105-129, at 2 (1997). PMI is often purchased

to cover loans with a loan to value ratio ("LTV") greater than 80 percent (i.e., where the loan is

---

[1] The plaintiffs also assert a number of state-law claims that are not now before the court.
[2] The Bank also filed a motion to strike the declaration of plaintiffs' expert James Panepinto. (ECF No. 131.)
Because the court finds that it is a proper Rule 56(d) declaration and its exclusion would not affect the outcome in
this case, that motion is denied.

for 80 percent or more of the property's value). *Id.* The Act was intended to make homeowners who were paying for the insurance aware "of their ability to get PMI coverage canceled," thus avoiding "unneeded PMI coverage [.]" S. REP. No. 105-129, at 3-4; *see also* H.R. REP. 105-55, at 6 (1997).

To this end, the HPA regulates the use and termination of two types of PMI in connection with residential mortgage transactions[3]: borrower paid mortgage insurance ("BMPI"), which is "private mortgage insurance that is required in connection with a residential mortgage transaction, payments for which are made by the borrower," 12 U.S.C. § 4905(a)(1), and lender paid mortgage insurance ("LPMI"), which is "private mortgage insurance that is required in connection with a residential mortgage transaction, payments for which are made by a person other than the borrower," *id.* § 4905(a)(2).

Where LPMI "is required in connection with a residential mortgage transaction," the HPA mandates that lenders make certain written disclosures to borrowers, *id.* § 4905(c), and that the disclosures be made "not later than the date on which a loan commitment is made," *id.* § 4905(c)(1). These disclosures generally compare LPMI with BPMI, and include, among other things, the facts that LPMI "may not be cancelled by the mortgagor," *id.* § 4905(c)(1)(A), and that LPMI usually causes a mortgage interest rate to be higher than that of a mortgage with BPMI, *id.* § 4905(c)(1)(B)(i). The HPA creates a cause of action for its violation. *Id.* § 4907.

## II.     The Bank's "No Fee Mortgage Plus" Program

---

[3] A "residential mortgage transaction" is "a transaction . . . in which a mortgage . . . is created or retained against a single-family dwelling that is the principal residence of the mortgagor to finance the acquisition, initial construction, or refinancing of that dwelling." 12 U.S.C. § 4901(15).

In 2005, the Bank began to develop a new mortgage program to be called No Fee Mortgage Plus ("NFMP"). (Dep. of Pat Mooney[4] 16-17, Def.'s Mot. Summ. J. Ex. 1, ECF No. 127-3.) NFMP was designed to simplify the mortgage process for both consumers and the Bank's thousands of branches around the country, and to increase the Bank's overall market share of mortgages for home purchases. (*Id.* at 17-18.) The Bank began a pilot of NFMP in Washington State in September 2006, offering loans with no mortgage insurance (even for loans with an LTV greater than 80 percent), no closing costs, and various other features. (*Id.* at 27; *see also* BANA-DWOSKIN-000007566, Pls.' Cross-Mot. Summ. J. Ex. D, ECF No. 130-5.) The Bank began a second pilot in eight additional states in February 2007. (Bank Resps. Interrogs. ¶ 2, Def.'s Mot. Summ. J. Ex. 7, ECF No. 127-9.) During this pilot, the Bank experimented with increasing interest rates for loans with an LTV greater than 80 percent, but ultimately decided against doing so. (Mooney Dep. 54-56, 64-65.) The Bank launched NFMP nationally on April 23, 2007. (Bank Resps. Interrogs. ¶¶ 2, 4.) The Bank maintains that loans with a high LTV were not assigned higher interest rates than other loans. (Mooney Dep. 65.) Further, the Bank represented that it intended to hold the loans itself rather than sell them to others. (*Id.* at 76.)

During the financial crisis that began in the summer of 2007, however, the Bank sought to sell some of its NFMP loans to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") as a means of "enhancing liquidity." (Bank Resps. Interrogs. ¶ 19; Dep. of Peter Dent[5] 204, Def.'s Mot. Summ. J. Ex. 3, ECF No. 127-5.) But Fannie Mae and Freddie Mac would buy loans with an LTV greater than 80 percent only if those loans were insured. (Bank Resps. Interrogs. ¶ 19.) The Bank therefore

---

[4] Pat Mooney is the Bank's Rule 30(b)(6) designee on product development. (Pls.' Reply Supp. Cross-Mot. Summ. J. 10, ECF No. 136.)
[5] Peter Dent is the Bank's Rule 30(b)(6) designee on mortgage insurance. (Dent. Dep. 15-17.)

began to investigate options for purchasing post-closing mortgage insurance for such loans. (Mooney Dep. 100-01; Dent Dep. 48.) The Bank called this insurance, which it paid for itself, a "post-closing credit enhancement." (Dent Dep. 73-74, 208.) In practice, the Bank would pool together many loans and seek bids for the price of insurance from third-party insurance providers. (Bank Resps. Interrogs. ¶ 19.) It began to request such bids as early as May 25, 2007, and it made its first bulk insurance purchase for 5,303 NFMP loans on August 29, 2007. (*Id.* at ¶ 14; Dent Dep. 206-10.) By the end of 2007, the Bank had made five bulk purchases of post-closing mortgage insurance for a total of more than 10,000 loans. (Dent Dep. 210.)

Deposition testimony established that the process by which loans were insured post-closing occurred as follows. When the Bank first started obtaining post-closing mortgage insurance, the Bank's corporate investment group, which managed the balance sheet, produced "loan lists" of NFMP loans it wanted to insure. (*Id.* at 147.) Later, the Bank moved to a system under which the Bank's investor relations group assigned newly funded loans a "special code" indicating they "could be insured." (*Id.* at 149, 153.) This occurred within a few weeks of the loans' funding. (*Id.* at 102-03.) Loans marked with this code were then held in a "virtual warehouse" before they were "sen[t]" to the mortgage insurance companies. (*Id.* at 149-50.) Then, through a "rolling insuring process," the Bank insured the loans through third-party insurance providers. (*Id.* at 147.) The Bank purchased this insurance through "forward agreements" with mortgage insurance companies under which the companies "would agree to purchase a certain amount of [NFMP] loans over a certain period of time." (*Id.* at 220.) Under these agreements, the Bank would "deliver" several thousand loans to the mortgage insurance companies every few weeks. (*Id.* at 220-21.)

4

Starting in 2008, the Bank sought to use this method to insure every NFMP loan with an LTV greater than 80 percent; where such loans were not insured, it was generally because "they did not meet the eligibility requirements of the mortgage insurance" providers. (*Id.* at 221-22.) Central to this case is the undisputed fact that the Bank did not disclose to the plaintiffs the information the HPA mandates a lender disclose when LPMI "is required in connection with a residential mortgage transaction[.]" 12 U.S.C. § 4905(a)(2).

The Bank decided to stop making NFMP loans soon after purchasing Countrywide Financial Corporation in 2009. (Mooney Dep. 134.) Active marketing for the program concluded in April 2009, (Bank Resps. Interrogs. ¶ 3), the last NFMP loans were made on April 4, 2009, and the "final fund date" for the loans was May 29, 2009, (*id.* at ¶ 4). By that time, the Bank had made approximately 146,879 NFMP loans. (*Id.* at ¶ 9.) Of these, the Bank retained 57,470 and sold 89,409 on the secondary market: 48,367 to Fannie Mae and 41,042 to Freddie Mac. (*Id.* at ¶ 26.) As of April 17, 2013, the Bank was servicing 64,576 active NFMP loans, and 32,088 of those loans were insured, held by Fannie Mae or Freddie Mac, and not delinquent. (*Id.* at ¶ 12.)

### III.    The Plaintiffs' NFMP Loans

The amended complaint names the following individuals and couples who received a total of 13 NFMP loans: (1) Mark Augustson of North Carolina; (2) Teresa Butler of Florida; (3) Linda Campbell of North Carolina; (4) Donna Cuadra and Alfred Figley of California; (5) Sean and Jennifer Decker of Maryland; (6) Kelly and Stefani Dills of Texas; (7) Matthew and Randi Dwoskin of Maryland; (8) Robert and Jeanne Kiel of North Carolina; (9) Joseph Prosser of Wisconsin; (10) Michael and Jennifer Walsh of New York; (11) Philip Wertheimer of Washington; (12) JoAnn and Shawn Woods of Arizona; and (13) Kerrie Zipprich of Illinois.

(Am. Compl. ¶¶ 8-20, ECF No. 52; Loan Summary, Def.'s Mot. Summ. J. Ex. 12, ECF No. 127-14.) Their loan amounts range from $112,500 to $500,564; the loans' interest rates range from 6 percent to 6.875 percent; and the loans' LTVs range from 83 percent to 95 percent. (Loan Summary.) The plaintiffs claim they were harmed in two ways: (1) by paying inflated interest rates to cover the costs of LPMI, and (2) by being precluded from refinancing, specifically through the federal government's Home Affordable Refinance Program ("HARP"), because of the mortgage insurance on their loans. (Am. Compl. ¶¶ 3, 37–38.)

The plaintiffs do not dispute that they never invoked the NFMP "Best Value Guarantee," (Def.'s Reply Supp. Mot. Summ. J. 23, ECF No. 132), and several plaintiffs testified that they took out loans with the Bank because they determined the NFMP loan was the best offer available to them. (K. Dills. Dep. 35, Def.'s Mot Summ. J. Ex. 10, ECF No. 127-12; Wertheimer Dep. 63-63, Def.'s Mot Summ. J. Ex. 10; J. Woods Dep. 47, Def.'s Mot Summ. J. Ex. 10; S. Woods Dep. 17-18, Def.'s Mot Summ. J. Ex. 10.) A mortgage broker told the Dwoskins, "The Bank of America offer is a good deal. I think you should do this deal with 15 percent down and them paying all costs." (M. Dwoskin Dep. 105, Def.'s Mot Summ. J. Ex. 10.) A different lender told Woods "they couldn't compete" and "recommended that [Woods] move forward with Bank of America." (S. Woods Dep. 18.)

The defendant argues that the deposition testimony of the Bank's employees demonstrates that the Bank did not increase interest rates on NFMP loans to offset the cost of insurance. Specifically, Dan Malouff[6] testified that "the higher LTVs were the costs to the bank… for the lack of mortgage insurance being charged to the consumer, those higher LTVs were literally negative revenue," and Dent testified that "there was no direct communication

---

[6] Dan Malouff is the Bank's Rule 30(b)(6) designee on pricing. (Pls.' Cross-Mot. Summ. J. 7, ECF No. 130-1.)

[between the Bank's mortgage insurance relations team] and Pricing." (Dep. of Dan Malouff

212, Def.'s Mot. Summ. J. Ex. 2, ECF No. 127-4; Dent Dep. 157.) In its answer to the plaintiffs'

interrogatories, the Bank explained that it calculated interest rates on NFMP loans through the

same process it used in setting interest rates on standard 30-year conforming mortgages, so the

interest rates for NFMP loans matched the market rates for conforming mortgages and did not

include fees for private mortgage insurance. (Bank Resps. Interrogs. ¶ 16.)

      The parties agree that the plaintiffs were unable to refinance their loans through the first

iteration of HARP because of the presence of mortgage insurance on their loans. Their inability

to do so stemmed from the fact that under HARP's first iteration, "some servicers and lenders

declined to refinance loans with mortgage insurance." (HARP: A Mid-Program Assessment 27,

Def.'s Mot. Summ. J. App. A, ECF No. 127-16; Malouff Dep. 174.) The Bank points out that the

plaintiffs' NFMP loans would have been ineligible for HARP if the Bank had not placed

mortgage insurance on their loans because Fannie Mae and Freddie Mac would not have bought

the plaintiffs' loans without mortgage insurance. (Def. Mot. Summ. J. 28-29; Fannie Mae

charter, Mot. Dismiss Ex.4, at §§ 302(b)(2) and 302(b)(5)(C), ECF No. 9-5; Freddie Mac charter,

Mot. Dismiss Ex. 5, at §§ 305(a)(2) and 305(a)(4)(C), ECF No. 9-6.) In their cross-motion for

summary judgment, the plaintiffs do not dispute that they would have been unable to refinance

through HARP if the Bank had not put mortgage insurance on their loans but argue that the

LPMI precluded some of the plaintiffs from refinancing through other programs. (Dills Dep. 56-

57, Pls.' Cross-Mot. Summ. J. Ex. H, ECF No. 130-9). The defendant maintains that

conventional refinancing always remained available to the plaintiffs, evidenced by the fact that

plaintiffs Butler, Campbell, Dills, Walsh, and Kiel refinanced conventionally. (Def.'s Mot.

Summ. J. 13; Loan Summary; Butler Dep. 193, 210, Def.'s Mot Summ. J. Ex. 10; Campbell

Resps. to Interrogs. ¶ 8, Def.'s Mot Summ. J. Ex. 9, ECF No. 127-11; Dep. Ex. 213, Def.'s Mot.

Summ. J. Ex. 11, ECF No. 127-13; M. Walsh Resps. to Interrogs. ¶ 8, Def.'s Mot Summ. J. Ex.

9; R. Kiel Dep. 90, Def.'s Mot Summ. J. Ex. 10; R. Kiel Resps. to Interrogs. ¶ 8, Def.'s Mot

Summ. J. Ex. 9.) In HARP's second iteration "the majority of mortgage insurance companies

voluntarily agreed to make the mortgage insurance policies fully transferable to new HARP

loans." (HARP: A Mid-Program Assessment 27.) All of the plaintiffs have refinanced below

their original interest rate using HARP 2, conventional refinancing, or a VA loan. (Loan

Summary.)

## IV.    Procedural History

The original plaintiffs in this suit, Matthew and Randi Dwoskin, filed their complaint

against the Bank on April 28, 2011. The court denied the Bank's motion to dismiss in a

memorandum and order on March 26, 2012. The plaintiffs filed an amended complaint on May

25, 2012, adding the additional plaintiffs named above and a proposed class of similarly situated

plaintiffs. The court denied nearly all of the Bank's motion to dismiss the amended complaint,

including the HPA claims at issue here, as well as the Bank's motion seeking an interlocutory

appeal, in a memorandum and order on January 31, 2013.[7]

Pursuant to a scheduling order, the Bank filed a motion for summary judgment on the

plaintiffs' HPA claim on November 7, 2014. The plaintiffs opposed that motion and filed a

cross-motion for summary judgment on their HPA claim on December 23, 2014. The Bank filed

---

[7] The court dismissed the state law claims brought by plaintiffs Augustson, Kiels, and Prosser because they were
previously dismissed with prejudice in federal courts and also dismissed Woods' Arizona Consumer Fraud Act
claim because it was barred.

a motion to strike the declaration of the plaintiffs' proffered expert, James Panepinto, on January

30, 2015. All the motions have been fully briefed.

## ANALYSIS

### I.      The Parties' Motions for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party*

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit

under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477

U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving

party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable

inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see*

*also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the

same time, the court must "prevent factually unsupported claims and defenses from proceeding

to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

"When faced with cross-motions for summary judgment, the court must review each

motion separately on its own merits to determine whether either of the parties deserves judgment

as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "In considering each motion, [the court must] 'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392-93 (4th Cir. 2014) (quoting *Rossignol*, 316 F.3d at 523).

The chief issue before the court is whether the insurance placed on the plaintiffs' loans was LPMI within the meaning of the HPA; if so, the Bank violated the HPA's disclosure provisions applicable to LPMI. As already noted, the HPA defines LPMI as "private mortgage insurance that is *required* in connection with a residential mortgage transaction, payments for which are made by a person other than the borrower." 12 U.S.C. § 4905(a)(2) (emphasis added). Thus, the parties' dispute turns on whether the mortgage insurance the Bank purchased for the plaintiffs' loans was "required" within the meaning of § 4905(c).[8] The Bank claims the insurance was not required because its "loan commitment to the Plaintiff borrowers was not contingent on the acquisition of the insurance and because there was no impact on any Plaintiff borrower's loan terms." (Def.'s Reply Supp. Mot. Summ. J. 1.) The plaintiffs counter that the insurance was required because it was "mandatory, and not optional, to the consumer." (Pls.' Cross-Mot. Summ. J. 11.)

As this court has previously noted, "[t]here is little case law interpreting or enforcing § 4905," *Dwoskin v. Bank of America, N.A.*, 850 F. Supp. 2d 557, 564 (D. Md. 2012), and the parties cite just two federal cases (and the court is aware of no others) that discuss the meaning of "required" within that section: *Augustson v. Bank of America, N.A.*, 864 F. Supp. 2d 422

---

[8] The Bank does not argue that the insurance was not purchased "in connection with a residential mortgage transaction."

(E.D.N.C. 2012) and *O'Connor v. Wells Fargo Home Mortgage, Inc.*, No. 1:08-CV-0281-JEC, 2011 WL 248006 (N.D. Ga. Jan. 24, 2011).[9] In both cases, however, one denying a motion to dismiss and one granting a motion for summary judgment, the court relied on the plausible allegation, or the stipulation of fact, that the bank charged higher interest rates to the borrower to pay for the LPMI. In denying the Bank's motion to dismiss the amended complaint, this court previously explained that "[w]hether the Bank actually had an intention to place LPMI on the loans all along, and whether the Bank charged higher interest rates to account for this when it entered into the loan agreements with the plaintiffs, remain open factual questions." *Dwoskin v. Bank of Am., N.A.*, 2013 WL 427362, at *3 (D. Md. Jan. 31, 2013).

The court agrees with the Bank that "[w]hether mortgage insurance falls within the meaning of the HPA requires an examination of how a lender pays for mortgage insurance, 'and whether the purchase or decision to purchase was before the date on which [the] loan commitment [was] made[.]'" (Def.'s Mot. Summ. J. 17 (quoting *Augustson*, 864 F. Supp. 2d at 430).) Disclosure may be required under the HPA even if LPMI is placed on a mortgage after closing, if the lender had the intention at closing to place mortgage insurance on the loan and charged a higher interest rate to subsidize the cost of the insurance, or otherwise conditioned issuance of the loan on obtaining LPMI for it.

The evidence in this case shows that, as the Bank argues, it bought and paid for mortgage insurance on groups of loans after the loans were closed and funded without affecting the terms of any individual borrower's loans. Not all NFMP loans were eligible for the LPMI coverage, but those loans were not rescinded. And there is not sufficient evidence to show that the

---

[9] Unpublished cases are cited not as precedent but for the relevance and persuasiveness of their reasoning.

plaintiffs paid a higher interest rate in order to finance the purchase of mortgage insurance by the Bank.

As the legislative history of the HPA makes clear, the statute is designed to protect homeowners from paying for private mortgage insurance for the life of the loan because they are unable to cancel it. *See* S. REP. No. 105-129, at 3 ("[M]any homeowners have experienced problems canceling unneeded PMI. Homeowners that do not refinance or buy another home could continue to pay for the PMI coverage for the entire life of the loan."); *see also* H.R. REP. 105-55, at 6 ("Legislation is needed to establish Federal standards for disclosure and termination of PMI so that borrowers do not pay for insurance after all parties in the mortgage process agree that such insurance is no longer necessary."). If the plaintiffs never paid for the insurance, which in this case would have been in the form of a higher interest rate, and if no individual loan was conditioned on being able to obtain insurance, mortgage insurance was not "required" within the meaning of the HPA.

None of the evidence the plaintiffs cite creates a genuine issue of material fact concerning whether they paid an increased interest rate to subsidize the cost of LPMI. Placing Malouff's deposition testimony in context, it is clear that he said the mortgage insurance did not change the price of the plaintiffs' loans; instead "[t]he cost [of the mortgage insurance] was just something that deteriorated profit margin." (Dep. of Dan Malouff 49-50.) The two emails from non-management Bank employees also fail to demonstrate an increased rate, as neither mentions mortgage insurance. (BANA-DWOSKIN-000068470, Pls.' Cross-Mot. Summ. J. Ex. D; BANA-DWOSKIN-000068468, Pls.' Cross-Mot. Summ. J. Ex. D.) Moreover, the statement that "[w]e are clearly increasing our rate to help make up for some of the fees being waived" explicitly

addresses waived fees, not insurance. (BANA-DWOSKIN-000068468.) The statement that

NFMP loans had a "higher rate (.625) in Distributed Retail primarily to account for the higher

cost to originate" is explained in Mooney's deposition where she testified that retail loan officers

were paid on commission, "[s]o the cost to originate a loan was higher" in the Distributed Retail

channel than other channels, and to account for the commissions, "[the Bank] may have had an

adjustment in price from time to time." (BANA-DWOSKIN-000158120, Pls.' Cross-Mot.

Summ. J. Ex. G, ECF No. 130-8; Mooney Dep. 86-87.) Furthermore, none of the plaintiffs

invoked the Bank's "Best Value Guarantee" or claim that a different program would have

offered them a better deal.

The defendant's Rule 30(b)(6) designees testified consistently throughout their

depositions that the Bank did not increase interest rates on the loans to offset the cost of

insurance. (*See* Malouff Dep. 212 ("[T]he higher LTVs were the costs to the bank… for the lack

of mortgage insurance being charged to the consumer, those higher LTVs were literally negative

revenue."); Malouff Dep. 102-03 ("The way we priced, as I outlined before, using price

optimization on our standard conforming 30-year with regular borrower paid mortgage insurance

was used to set the rates. And the NFMP product was connected to those rates and prices so that

they would be exactly the same, and that never changed."); Dent Dep. 197-98 ("[T]here was no

mortgage insurance folded into the cost of the product."); Mooney Dep. 65 ("There were no risk

adjustment adders for [loans with LTV ratios] over 80 percent with the national rollout.");

Mooney Dep. 99 ("It was lender paid mortgage insurance after the closing…. [I]t didn't impact

the customer in any way, from a financial perspective[.]"). In its response to the plaintiffs'

interrogatories, the Bank explained that "the interest rates on NFMP loans matched market rates

13

on 30-year conforming mortgage[s] and did not include any component for the payment of…

fees for private mortgage insurance, which were not factored into interest rates." (Bank Resps.

Interrogs. ¶ 16.)

Finally, the plaintiffs' Fed. R. Civ. P. 56(d) declarations do not support the plaintiffs'

argument that "summary judgment would be premature and improper without further discovery."

(Pls.' Reply Supp. Cross-Mot. Summ. J. 2.) Plaintiffs' expert James Panepinto asserts that the

Bank's 30(b)(6) deposition testimony does not "adequately address several important questions

in this case," but the plaintiffs could have asked the questions Panepinto raises now at the

depositions. (*See* Panepinto Decl. ¶ 18, ECF No. 130-2.) Plaintiffs' counsel James White claims

that the plaintiffs need access to pricing documents and Rule 30(b)(1) depositions to support

their allegation that the Bank raised interest rates, but four 30(b)(6) depositions have been

conducted and the Bank has answered the plaintiffs' interrogatories, consistently denying an

interest rate bump. (*See* White ¶¶ 9, 11, ECF No. 130-3.) Additionally, White admits that the

Bank has already produced a database of electronically stored information that contains "tens of

thousands of documents." (White Decl. ¶ 7.) There has not been a sufficiently specific showing

that additional discovery is likely to result in evidence that would alter what has already been

established. Because the Bank did not raise interest rates to subsidize the cost of mortgage

insurance, or otherwise condition issuance of the loan on obtaining mortgage insurance, the court

will grant the Bank's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the Bank's motion for summary judgment will be granted,

and the plaintiffs' cross-motion for summary judgment will be denied.

A separate order follows.


<u>September 30, 2015</u>                             <u>                    /S/                    </u>
Date                                            Catherine C. Blake
                                                United States District Judge